UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MARK ROWELL, | Case No.: C 10-5656 PSG |
| Plaintiff, | **ORDER GRANTING-IN-PART** |
| v. | **PLAINTIFF'S MOTION TO COMPEL** |
| AVIZA TECHNOLOGY HEALTH AND WELFARE PLAN and HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, | **(Re: Docket No. 26)** |
| Defendants. | |

In this ERISA suit over disability insurance benefits, Plaintiff Mark Rowell ("Rowell") moves to compel Defendant Hartford Life and Accident Insurance Company ("Hartford") to respond in full to Rowell's interrogatory nos. 3, 4, 7, 8, 11, and 12, as well as request for production ("RFP") nos. 2 and 4.[1] Having considered the briefs, oral argument, evidence and authority presented by both parties, Rowell's motion to compel is GRANTED-IN-PART.

**I. BACKGROUND**

Defendant Aviza Technology Health and Welfare Plan ("the Plan") is an employee welfare benefit plan that was established by Aviza Technology, Inc. ("Aviza") under the federal Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. Hartford is the

---

[1] Rowell initially moved to compel a response to RFP no. 3 as well, but notes in his reply brief that Hartford has since produced the records requested and that RFP no. 3 is no longer at issue. *See* Docket No. 36 at 10.

1

Case No.: 10-5656 PSG
ORDER GRANTING-IN-PART PLAINTIFF'S MOTION TO COMPEL

insurer and claims administrator of the Plan, which provides long-term disability ("LTD"), life, and other insurance benefits to eligible Aviza employees.[2] Rowell is a former employee of Aviza. In 2006, Rowell allegedly developed symptoms of chronic fatigue, dizziness and memory impairment, leading to his inability by August 2007 to perform his work duties.[3] According to Hartford, Rowell was laid off by Aviza in late August 2007 as part of a general reduction-in-force.[4] Sometime thereafter, Rowell applied for LTD insurance benefits and for ongoing life insurance benefits under the Plan.[5]

Hartford initially approved Rowell's request for LTD coverage and paid LTD benefits to Rowell through December 22, 2009. However, Hartford denied Rowell the ongoing life insurance benefits. Rowell appealed the denial of life insurance benefits in January 2009, and in June 2010, separately appealed the denial of LTD benefits after December 22, 2009.[6] As part of the appeal processes and in order to conduct physician and psychologist peer reviews of the medical evidence, Hartford retained the services of three medical organizations. These three organizations are Behavioral Medical Interventions ("BMI"), MES Solutions ("MES"), and University Disability Consortium ("UDC").

Hartford denied both appeals.[7] On December 13, 2010, Rowell filed this action, seeking recovery of disability insurance benefits and life insurance coverage under the Plan and pursuant to 29 U.S.C. § 1132(a)(1)(B), as well as reasonable attorney's fees and costs pursuant to § 1132(g).

---

[2] *See* Compl. ¶¶ 10-16 (Docket No. 1).

[3] Rowell claims that since August 16, 2007, he has been unable to perform his or any other occupation due to the chronic fatigue syndrome. *See* Docket No. 1 ¶ 20.

[4] *See* Docket No. 34 at 4.

[5] Rowell does not specify the date that he first applied for LTD benefits in the complaint or moving papers. Hartford states that it received the application from Rowell for LTD benefits in July 2008. *See id.*

[6] *See* Docket No. 1 ¶¶ 22-28.

[7] *See* Docket No. 34 at 5-6, 8.

2
Case No.: 10-5656 PSG
ORDER GRANTING-IN-PART PLAINTIFF'S MOTION TO COMPEL

On May 17, 2011, Rowell served a number of interrogatories and RFPs on Hartford. Subsequent to two stipulations extending the time for Hartford to respond to the discovery requests, Hartford responded on July 15, 2011. Rowell disputes the adequacy of Hartford's response and moves to compel full responses to the following:

Interrogatories 3, 7, and 11 seek: "the number of disability insurance claims and waiver of life insurance premium claims in which Hartford obtained an examination or medical record review from [BMI, MES, and UDC, respectively,] and how much Hartford paid for such examinations and reviews for the years 2008, 2009, 2010, and 2011."[8] Interrogatories 4, 8, and 12 seek: "the number of claims in which [BMI's, MES's, and UDC's, respectively,] reviewing expert opined that the claimant was not disabled as of the time of the examination or review. Please specify the statistics on a yearly basis."[9]

In RFP no. 2, Rowell requests:

All documents describing or defining Hartford's internal procedures for handling and deciding whether to grant disability insurance claims and waiver of life insurance premium claims, including any guidelines specific to California claimants, for the period of March 31, 2009 through November 9, 2010. This request specifically includes a request for the disability insurance claims manuals used by Hartford.[10]

In RFP no. 4, Rowell requests:

All recorded telephone conversations regarding plaintiff between Hartford's personnel and any of the following: Anne MacGuire, M.D., John L. Brusch, M.D., Robert Marks, M.D., Jacquelyn Olander, Ph.D., Michael Raymond, Ph.D., Joseph Ricker, Ph.D., personnel of Behavioral Medical Interventions personnel of MES Solutions, or personnel of University Disability Consortium.[11]

---

[8] Docket No. 26, Ex. B.

[9] *Id.*

[10] *Id.*

[11] *Id.*

In its July 15 responses, Hartford stated a range of objections to the disputed interrogatories. At issue in this motion are Hartford's objections based on relevance of the information sought to the subject matter of the litigation, the cost and burden to Hartford of collecting the information, and whether such discovery is proper in an ERISA matter. With respect to RFP no. 2, Hartford has agreed to produce selected portions of its claims manual under a protective order. The parties disagree, however, over production of one section of the manual relating to the Unfair Claims Settlement Practices Act. Hartford objects to producing the telephone records requested in RFP no. 4 on the grounds that they are not relevant under the applicable provision of ERISA, and would create an undue burden on Hartford to produce.

Rowell argues that all of the requested documents and interrogatory responses are highly relevant to his claim that Hartford's position as both the claims administrator for the Plan and the insurer and funder of benefits paid from the Plan creates a conflict of interest that ultimately the court must weigh in determining whether Hartford abused its discretion in denying his claims.[12] He also argues that recent Supreme Court and Ninth Circuit precedent make abundantly clear that insurers such as Hartford should be prepared to produce the type of evidence requested.

## II. SCOPE OF DISCOVERY

Courts have historically limited discovery in ERISA cases consistent with ERISA's goal to "provide a method for workers and beneficiaries to resolve disputes over benefits inexpensively and expeditiously."[13] In this circuit, such limited discovery was restricted to that which would address a plaintiff's burden to produce "material probative evidence" that a denial of benefits was

---

[12] *See Metropolitan Life Ins. v. Glenn*, 554 U.S. 105, 117 (2008). *See also Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 888 (9th Cir. 2008).

[13] *See Taft v. Equitable Life Assur. Soc'y*, 9 F.3d 1469, 1472 (9th Cir. 1993), *abrogated by Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 973 (9th Cir. 2006). *See also Boyd v. Bell*, 410 F.3d 1173, 1178 (9th Cir. 2005).

4
Case No.: 10-5656 PSG
ORDER GRANTING-IN-PART PLAINTIFF'S MOTION TO COMPEL

motivated by an administrator's conflict of interest.[14] More recently, the Ninth Circuit has clarified that in reviewing the ERISA plan administrator's decision for abuse of discretion,[15] the court weighs a conflict of interest as a factor and looks to "all the facts and circumstances" to determine "how much or how little to credit" the administrator's decision to deny coverage.[16] In making such a case-by-case credibility determination of the administrator's decision in the face of a conflict of interest,[17] the court "may consider evidence outside the [administrative] record."[18]

The parties dispute the appropriate scope and extent of discovery in this context. Rowell argues that Fed. R. Civ. P. 26(b)[19] sets the boundaries for the discovery to which he is entitled, and moreover, that the interrogatories and RFPs at issue seek information both relevant and necessary to inform the court's determination of the extent to which Hartford's denial of Rowell's benefits request may have been impacted by a conflict of interest. Hartford argues that ERISA's goals and recent case law require any discovery to be "narrowly tailored to the facts of [Rowell's] case" and "sufficiently focused in relation to the claims history issue."[20]

---

[14] *See Abatie*, 458 F.3d at 966 (citing and overruling *Atwood v. Newmont Gold Co.*, 45 F.3d 1317 (9th Cir. 1995)). A conflict of interest exists when an insurer acts as both the plan administrator and the funding source of benefits. *See Glenn*, 554 U.S. at 108.

[15] The standard of review in an ERISA appeal depends on whether the plan at issue grants discretion to the administrator. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In this case Rowell asserts – and Hartford does not dispute – that the Plan confers discretionary authority on Hartford such that the court will review the decision for abuse of discretion. *See* Docket No. 26 at 11.

[16] *See Abatie*, 458 F.3d at 968.

[17] *See Saffon v. Wells Fargo & Co.*, 522 F.2d 863, 868 (9th Cir. 2008) (explaining that the reviewing court "must determine the extent to which the conflict influenced the administrator's decision and discount to that extent the deference we accord the administrator's decision").

[18] *See Abatie*, 458 F.3d at 970.

[19] Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. *See* Fed. R. Civ. P. 26(b).

[20] *See* Docket No. 34 at 9.

The court in *Abatie* provided examples of "facts and circumstances" relevant to weighing a conflict of interest:

> evidence of malice, of self-dealing, [] of a parsimonious claims-granting history [as well as if] the administrator provides inconsistent reasons for the denial, *** fails adequately to investigate a claim or ask the plaintiff for necessary evidence, *** fails to credit a claimant's reliable evidence, *** or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.[21]

The Supreme Court in *Glenn* further explained that a structural conflict of interest

> should prove more important … where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration *** [and] should prove less important … where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits."[22]

Using these references as guideposts to the type of information – extrinsic to the administrative record – that should be assessed in an ERISA case involving conflict of interest, courts have sought to balance limiting discovery in ERISA cases with the need to consider extrinsic evidence suggesting bias.[23] The resulting trend is to allow discovery that is limited in scope and tailored to eliciting information on the pertinent conflict of interest and its effect on the benefits decision being appealed.[24]

---

[21] *See Abatie*, 458 F.3d at 968-69 (citations omitted).

[22] 554 U.S. at 117.

[23] *See, e.g., Baldoni v. Unumprovident, Illinois Tool Works, Inc.*, CV No. 03-1381-AS, 2007 WL 649295 (D. Or. 2007) ("[T]he rationale for allowing discovery in certain ERISA cases remains persuasive in light of *Abatie*. However, the rationale for constraining discovery remains equally in force.").

[24] *See, e.g., Baldoni*, 2007 WL 649295, at *7 (deciding that "[i]n light of ERISA's purpose, conflict of interest discovery should not be unlimited"); *Groom v. Standard Ins. Co.*, 492 F. Supp. 2d 1202, 1205-06 (C.D. Cal. 2007) (concluding that discovery in ERISA case "must be narrowly tailored[,] must not be a fishing expedition" and "must be limited to requests that are relevant to 'the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record'") (quoting *Abatie* at 967)); *Klein v. Northwest Mut. Life*, Case No. 09cv2843 W(NLS), 2011 WL 2579778, at *5 (S.D. Cal. June 29, 2011) (allowing discovery of "relevant evidence as to

## III. DISCUSSION

Rowell seeks Hartford's complete response to each set of interrogatories relating to its use of BMI, MES, and UDC's peer review services. Hartford argues that the interrogatories, which inquire into Hartford's relationship with those organizations over four years and in relation to thousands of claims, improperly seek information far beyond the allowable scope. Hartford similarly contends that RFP no. 4 casts a wide and expensive net seeking information not relevant to Rowell's claim.

### A.     Interrogatories 3, 7, and 11

Interrogatories 3, 7, and 11 seek information regarding the frequency with which Hartford used the medical peer review services, and how much Hartford paid for those services since 2008. Hartford complains that the requests are not narrowly tailored because they span four years and all three physician organizations, and not relevant because payment information merely establishes that a business relationship exists between Hartford and BMI, MES, and UDC. Hartford suggests that based on its denial of Rowell's claim in 2009 and of his appeal in 2010, at most, "two years of statistics would be necessary."[25] Hartford further argues that discovery of the confidential and proprietary financial information would allow Hartford's competitors to obtain cost information for Hartford's third-party vendors.[26]

Rowell argues that statistical information on frequency and finances is relevant to weighing conflict of interest because "the more business a physician review organization does with Hartford,

---

the nature, extent and effect of the conflict," including at a minimum discovery into "the compensation, guidance, and performance evaluations given to the people involved in the handling of [plaintiff's] claim, as well as at least statistical information as to the number of claims handled and denied").

[25] *See* Docket No. 34 at 12.

[26]*See id.* Hartford alleges that Rowell has refused to accept the information under a protective order and has refused to compromise on the number of number of years or claims for which it seeks this information. *See* Docket No. 35 ¶ 3.

7
Case No.: 10-5656 PSG
ORDER GRANTING-IN-PART PLAINTIFF'S MOTION TO COMPEL

the less likely it is to be objective."[27] Rowell contends that evidence showing a large volume of business between Hartford and the companies would support an inference that Hartford uses those companies as a means of increasing its profit at the expense of the insured.[28] Because Hartford relied on the record review opinions generated by physicians at BMI, MES, and UDC in denying Rowell's claim, and because Rowell's claim arose in 2008, Rowell insists that information on all three organizations from 2008-2011 is appropriate.

Hartford's arguments as to relevance are not persuasive in light of the Supreme Court and Ninth Circuit precedent. For example, whether Hartford has a "history of biased claims administration"[29] is not ascertainable if Rowell cannot even determine how frequently Hartford used a certain company. Given the Supreme Court's acknowledgment, albeit in a different context, that non-treating "physicians repeatedly retained by benefits plans" might have an incentive to bias their reports toward a finding of "not disabled,"[30] frequency of retention and financial pay-out strikes the court as a legitimate inquiry.

Numerous courts in our district have approved discovery along both lines. For example, in *Walker v. Metropolitan Life Ins.*, the court denied cross-motions for summary judgment on plaintiff's ERISA claim, in no small part because "MetLife knows [the third-party review company] benefits financially from doing repeat business with it" and that the company received

---

[27] *See* Docket No. 26 at 12 (citing *Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) (acknowledging the validity of the "concern that physicians repeatedly retained by benefits plans may have an 'incentive to make a finding of "not disabled" in order to save their employers money and to preserve their own consulting arrangements'")).

[28] *See id.*

[29] *See Glenn*, 554 U.S. at 117.

[30] *See Black and Decker*, 538 U.S. at 832. In this case, the Court considered whether an ERISA plan administrator was required to accord special deference to opinions of treating physicians as opposed to physicians employed by third-party review groups. The Court concluded that treating physicians would receive no special deference, in part because just as third-party review physicians could be biased against a finding of disabled, a treating physician could be biased in the opposite direction. *See id.*

more than $11 million from Met Life over a five-year time frame.[31] The court also approved discovery relating to the number of claims Met Life had referred to the third-party company.[32] Likewise, in *Caplan v. CNA Financial Corp.*, the court concluded that it would review the insurance company's decision with "commensurate skepticism" based on evidence that UDC, the third-party review company, received "more than thirteen million dollars from Hartford since 2002" and "knows that UDC has an incentive to provide it with reports that will increase the chances that Hartford returns to UDC in the future."[33] And in *Miranda v. First Reliance Standard Life Insurance Co.*, the court granted-in-part plaintiff's motion to compel discovery regarding the insurer's use of MES as a third-party medical record reviewer over the course of six years, including number of referrals and money paid for review services.[34]

In sum, Hartford's concerns regarding the expansive breadth of interrogatories 3, 7, and 12 and their lack of relevance to Rowell's particular claim is unsupported by case law in this district. As the insurer and administrator of Rowell's benefits, Hartford is obligated to produce information that will help the court determine how much weight to ascribe, if any, to Hartford's conflict of interest. The number of times that Hartford used each company over the three-year time period and the total amount paid out is permissible conflict of interest discovery and not unduly burdensome to produce.

**B.     Interrogatories 4, 8, and 12**

Interrogatories 4, 8, and 12 seek statistics on a yearly basis on the number of claims reviewed by BMI, MES, and UDC physicians in which the "reviewing expert opined that the claimant was not disabled." Hartford argues that this line of question is burdensome, irrelevant, and

---

[31] 585 F. Supp. 2d 1167, 1175 (N.D. Cal. 2008).

[32] *See id.*

[33] 544 F. Supp. 2d 984, 991-92 (N.D. Cal. 2008).

[34] CV 09-4452 RS (NJV), 2011 WL 2441762, at *5 (N.D. Cal. June 15, 2011).

highly improper in the ERISA context. Hartford first argues that the information is not reasonably calculated to lead to admissible evidence because the merits of those claims are not at issue, and the information sought is meaningless taken out of context of the specific facts of each of those cases.[35] Hartford also argues that the reviewing physicians are not asked to draw a conclusion whether the claimant is disabled or not disabled, but rather answer a number of questions pertaining to the claimant's functional capacity and any restrictions or limitations. Because the BMI, MES, and UDC physicians do not make the ultimate disability determination, Hartford contends that Rowell's interrogatories have no bearing on the question of Hartford's conflict of interest.[36]

Although Rowell argues that Hartford provides insufficiently vague references to the burden or cost that would be imposed on it, he has offered to curb his request to only "the number of cases in which [Hartford] denied the claim within six months of the review by UDC, MES, or BMI."[37] In *Walker*, the court ordered just such an inquiry to take place, requiring MetLife to provide statistics on the "number of claims denied in reliance on [third-party physician reviewer] reviews."[38] The court rejected the insurer's claim that producing the information would require more than 2,200 hours of work and be unduly burdensome and expensive, because "without this information, the influence of MetLife's conflict of interest as compounded by its reliance on [the third-party company] cannot readily be determined by the record."[39] The court also noted that such information was consistent with the Ninth Circuit's advice to conflicted ERISA plan administrators

---

[35] *See* Docket No. 34 at 13.

[36] *See id.* at 14 (citations omitted).

[37] *See* Docket No. 36 at 5; Docket No. 30-1, Ex. A at 5.

[38] *See id.*

[39] *See id.*

"'to bring forth affirmative evidence that any conflict did not influence its decisionmaking process.'"[40]

In this case, interrogatories 4, 8, and 12 are not sufficiently limited to information that might illuminate the "effect on the decision-making process of any conflict of interest that may appear in the record."[41] The court is nevertheless persuaded that at least a portion of the requested statistical information is necessary to evaluate whether Hartford has a "history of parsimonious claims granting." The appropriate balance between this need and the need to minimize the burden on Hartford is as follows: for each of the years 2009 and 2010, Hartford shall supplement its interrogatory responses to identify the percentage of claims submitted to BMI, MES, and UDC that resulted in a decision by Hartford within six months to deny benefits.

## C.   Requests for Production nos. 2 and 4

The parties have agreed on the production of all but one section of the claims manual at issue in RFP no. 2. Rowell seeks production of the "Unfair Claims Settlement Practices Act" section. Although it relates to state law, rather than ERISA, Rowell claims that the section is relevant to this action because ERISA exempts from preemption state laws that regulate insurance.[42] To the extent this issue remains in dispute, the court is not persuaded that Hartford faces a burden whatsoever to producing the disputed section, no matter how limited its relevance. Hartford shall produce the section.

In RFP no. 4, Rowell requests the telephone records between Hartford's personnel and UDC, MES, and BMI doctors and staff. The parties dispute whether these records fall within ERISA's definition of the administrative record, which must be produced to a claimant appealing a

---

[40] *Id.* (quoting *Abatie*, 438 F.3d at 969). *But see Dilley v. Metropolitan Life Ins. Co.*, 256 F.R.D. 643, 645 (N.D. Cal. 2009) (rejecting similar request due to the "relative inaccessibility" of the information sought).

[41] *See Abatie*, 458 F.3d at 967.

[42] *See* Docket No. 36 at 12 (citing 29 U.S.C. § 1144(b)(2)(A)).

benefits denial. Hartford argues that although it produced similar records in response to RFP no. 2, it did so as a matter of compromise and not to concede that the records are "relevant" under ERISA regulations. Rowell argues that he is entitled to a copy of the phone conversations, because they were generated during the course of his benefits determination.

ERISA regulation requires certain records be produced to a claimant, including "all documents, records, and other information relevant to the claimant's claim for benefits."[43] The regulation defines such a record or document to be "relevant" if it 1) was "relied upon in making the benefit determination," or 2) was "submitted, considered, or generated in the course of making the benefit determination, without regard to whether [it] was relied upon in making the benefit determination."[44] Hartford concedes that the phone conversations at issue were "conducted during the course of the claim."[45] But Hartford argues that such recordings were not "generated" at that time, but would have to be generated after the fact by a request to retrieve the recording from the IT department.[46] More important, Hartford argues that such extensive discovery goes against ERISA's purpose of providing timely and cost-effective resolution of claims.

The court agrees with Rowell that the telephone conversations and recorded records thereof were "generated in the course of making the benefit determination" within the meaning of 29 C.F.R. § 23560.503-1(m)(8). The recorded conversations are therefore discoverable, subject to the overarching need to limit unduly burdensome discovery in ERISA cases. Although Hartford claims that retrieving such records would be excessively burdensome and costly, and would open the door to abusive discovery requests in ERISA cases, Hartford has provided no testimony or other

---

[43] *See* 29 C.F.R. § 2560.503-1(h)(2).

[44] *See id.* § 23560.503-1(m)(8).

[45] *See* Docket No. 34 at 18.

[46] *See* Docket 34-2 ¶ 2.

evidence that substantiates the extent of the burden.[47] Hartford therefore shall produce the records requested, consistent with the efforts it already undertook to retrieve the records requested by RFP no. 2.[48]

## IV. CONCLUSION

No later than November 18, 2011, Hartford shall provide the discovery required by this order. All other relief requested by Rowell is denied.

Dated: 10/31/2011

PAUL S. GREWAL
United States Magistrate Judge

---

[47] The declaration submitted by a Hartford team Team Leader whose responsibilities include "managing claims analysts" states only that "[i]n order to generate the recording, Hartford has to request and retrieve the recording from our IT department who makes the recorded calls available for retrieval by a Team Leader." *See* Docket 34-2 ¶ 2.

[48] *See* Docket No. 35 ¶ 2 ("Hartford is producing those recorded conversations with Plaintiff which it could locate.").