UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| MARK ROWELL, | ) | Case No.: C 10-5656 PSG |
| | ) | |
| Plaintiff, | ) | **FINDINGS OF FACT AND** |
| v. | ) | **CONCLUSIONS OF LAW** |
| | ) | |
| AVIZA TECHNOLOGY HEALTH AND | ) | |
| WELFARE PLAN and HARTFORD LIFE AND | ) | |
| ACCIDENT INSURANCE COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

On March 3, 2012, the court conducted a bench trial in this action for employer disability benefits.[1] Having considered the administrative record and the parties' written submissions, as well as the oral argument presented by counsel, the court now sets forth its Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a).

## I.        PROCEDURAL BACKGROUND

Plaintiff Mark Rowell ("Rowell") brings this action pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), against Hartford Life and Accident Insurance Company ("Hartford") and Aviza Technology Health and Welfare Plan (collectively, "Defendants"). Rowell alleges that Defendants improperly denied him ongoing benefits under the Plan's long-term disability ("LTD") and life insurance policies. Rowell seeks payment of

---

[1] The parties consented to a court trial before a magistrate judge pursuant to 28 U.S.C. § 636(c).

1    ongoing LTD benefits and a declaration of his ongoing coverage under the life insurance plan,

2    including a waiver of the life insurance premium.

3        Initially, the parties agreed that the court would review Hartford's termination decision

4    and denial of Rowell's appeal for abuse of discretion because the terms of the Plan conferred

5    discretionary authority on Hartford.[2] Based on this standard of review and on a related motion to

6    compel brought by Rowell, the court ordered Hartford to provide limited discovery relating to

7    Defendants' use of certain, third-party physician review organizations to evaluate medical

8    evidence submitted by claimants.[3] The authorized discovery would have facilitated the court's

9    assessment of any conflict of interest on the part of Hartford as plan administrator and its

10   determination of "how much or how little to credit" Hartford's decision to deny coverage.[4]

11       In order to avoid what it represented to be unduly burdensome and expensive discovery,

12   Hartford then offered to stipulate to *de novo* review, rather than have the court review Rowell's

13   claim under an abuse of discretion standard. Hartford sought reconsideration of the court's

14   October 31 discovery order in light of its stipulation.[5] For the reasons set forth in its February 10,

15   2012 order granting Hartford's motion for reconsideration, the court determined that it would

16   proceed with *de novo* review, and as a result, that Hartford need not provide data relating to its

17   use of third-party physician review agencies.[6]

18                          **II.    EVIDENTIARY RULINGS**

19       Rowell submits two documents that are not part of the Administrative Record in support

20   of his motion for judgment pursuant to Rule 52, and Defendants object to both of the extra record

21   submissions. The court finds that neither is necessary to the court's *de novo* review.

_____

[2] The standard of review in an ERISA appeal depends on whether the plan at issue grants discretion to the administrator. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[3] *See* Docket No. 49 (Order Granting-In-Part Plaintiff's Mot. To Compel) ("October 31 Order").

[4] *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 968 (9th Cir. 2006).

[5] Docket No. 57 (Def.'s Mot. for Reconsideration).

[6] *See* Docket No. 75 (Order Granting Mot. For Reconsideration).

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
For the Northern District of California

A.   **ROWELL'S SUPPLEMENTAL BRIEF AND UNIVERSITY OF THE PACIFIC FATIGUE LAB REPORT**

On February 16, 2012, Rowell filed a supplemental brief in support of his motion for judgment in order to offer a report from the University of the Pacific's Fatigue Lab[7] regarding Rowell's medical condition. Although any supplemental briefing on the Rule 52 cross-motions was due no later than February 6, 2012,[8] Rowell cites the court's February 10, 2012 ruling approving Defendants' offer to submit to a *de novo* standard of review[9] as grounds for the supplemental filing. Based on the shift to *de novo* review, Rowell argues that the court can consider extra-record evidence on the ultimate question of disability, and that the Fatigue Lab Report is necessary for the court to assess the medical issues and credibility issues raised in this case.[10] Defendants argue that Rowell's supplemental briefing is untimely, that the Fatigue Lab Report does not meet the strict standard for extra record evidence upon *de novo* review, and that it is inadmissible under Fed. R. Evid. 901 and 702.

For *de novo* review of an ERISA claim, the court "evaluates whether the administrator correctly or incorrectly denied benefits" and does so "based on the evidence in the administrative record."[11] In *Opeta v. Northwest Airlines Pension Plan for Contract Employees*, the court held that extra record evidence is appropriate in *de novo* cases only where the court finds that the "circumstances clearly establish" such evidence is "necessary to the district court's review."[12] The determination whether to admit evidence outside of the administrative record is made "under

---

[7] Docket No. 77-1 (University of the Pacific Cardiopulmonary Exercise Test (CPET) Evaluation Report: 2/15/2012) ("Fatigue Lab Report").

[8] *See* Docket No. 72 (Order Continuing Rule 52 Hearing).

[9] *See* Docket No. 75 at 4.

[10] Docket No. 76 at 2 (Pl.'s Supp. Rule 52 Br.) (citing *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 944 (9th Cir. 1995).

[11] *See Opeta v. Northwest Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1213 (9th Cir. 2007) (citing *Abatie,* 458 F.3d at 963).

[12] 484 F.3d at 1213 (citing *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1110-11 (9th Cir. 1999)).

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

the restrictive rule of *Mongeluzo*."[13] This standard for admitting extrinsic evidence under *Mongeluzo* and *Opeta* is narrow and limited only to those circumstances in which the district court, in its discretion, finds the evidence to be necessary in order to conduct an adequate *de novo* review of the benefit decision.[14]

Because the timing of the report renders it of limited relevance, it is not necessary for the court to consider the Fatigue Lab Report in order to render a decision on *de novo* review. The February 15, 2012 Fatigue Lab Report was based on tests conducted on January 30 and 31, 2011 and assesses functional capacity on those test dates, albeit as "a tool to evaluate disability in fatigue-related disorders."[15] As with the report initially rejected by the district court in *Mongeluzo*, the Fatigue Lab Report is dated more than two years after Rowell's claim and the medical evidence upon which Hartford was required to base its claims decision. The medical report in *Mongeluzo*, however, opined on the claimant's condition dating back to the relevant time period.[16] Moreover, in *Mongeluzo* the Ninth Circuit reversed the district court's exclusion of the report because other  precedent pertinent to the case rendered certain plan terms ambiguous and required "reevaluation of the evidence."[17] No such circumstances exist here. The court finds that it is able to evaluate the various grounds that Rowell relies upon to challenge Defendants' decision without consideration of the new evidence.[18] Thus, the court will not consider the Fatigue Lab Report or the later-filed, supporting declaration of Christopher R. Snell, Ph.D.[19]

---

[13] *See id.* (citing *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 943-44 (9th Cir. 1995)).

[14] *See id.* (citations omitted).

[15] *See* Docket No. 77-1 at 1.

[16] *Mongeluzo* 46 F.3d at 941.

[17] *See id.* at 944.

[18] *See Mongeluzo* 46 F.3d at 944 ("[A] district court should not take additional evidence merely because someone at a later time comes up with new evidence that was not presented to the plan administrator.").

[19] *See* Docket No. 83 (Snell Decl.).

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
For the Northern District of California

Because the court finds the material inadmissible under *Mongeluzo* and *Opeta*, the court need not consider Defendants' challenge pursuant to the Federal Rules of Evidence.

**B.   DECLARATION OF SCOTT KALE, M.D.**

Rowell also submits the Declaration of Scott Kale, M.D.[20] in support of his contention that the findings of certain reviewing physicians retained by Defendants in the course of evaluating Rowell's claims – as set forth in detail below – are not credible because the physicians may be subject to bias imposed by the reviewing organization. Rowell first submitted the Kale Declaration as an exhibit in support of his motion to compel discovery,[21] at which time Defendants also objected to its submission.[22]

At oral argument, Rowell argued that the Kale Declaration is necessary for the court's consideration of the weight that should be given Hartford's final review of Rowell's appeal of his LTD claim denial, in which Hartford relied heavily on the findings of two reviewing physicians from the same organization about which Kale testifies. The court finds that the Kale Declaration is unnecessary extra-record evidence because any credibility determination can be made based on the record evidence. As discussed below, Rowell's treating physician documented his disagreement with the reviewing physician whose opinion, in particular, Rowell challenges, and Hartford responded accordingly. Evidence sufficient for the court to make a determination regarding the reliability of this physician's findings is thus already present in the record.

---

[20] Docket No. 82 (Kale Decl.).

[21] *See* Docket No. 30 & 4 (Corrected Chabre Decl. in Support of Mot. to Compel Discovery), Ex. 3.

[22] *See* Docket No. 35 & 5 (Bernacchi Decl. in Support of Defs.' Opp'n to Pl.'s Mot. to Compel). In its ruling on Rowell's motion to compel, the court did not address the admissibility of the Kale Declaration.

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

## III.    FINDINGS OF FACT[23]

### A.    ROWELL'S PROFESSIONAL BACKGROUND AND OCCUPATIONAL REQUIREMENTS OF ROWELL'S POSITION

Rowell is a thirty-nine year-old man who completed high school and two years of college. Before his employment with Aviza Technology, Inc. ("Aviza"), Rowell held several positions as a mechanical designer and drafter, each lasting between two to five years.[24] Rowell worked at Aviza from September 5, 2005 to August 17, 2007 as a mechanical designer, earning approximately $5,833.33 per month.[25] According to Aviza, Rowell's job was primarily sedentary, requiring "occasional" standing, walking, reaching/ working overhead, and keyboard use. It required "frequent" sitting, and could be performed by alternating sitting and standing.[26] According to Rowell, the job required that he spend eighty percent of his time on the computer and was mentally strenuous.[27]

During Rowell's time at Aviza, he did not seek leave or disability.[28] He informed his employer of his symptoms, however, which impaired his ability to concentrate and interfered with his work on the computer. Aviza provided him with an ergonomic assessment.[29] Human Resources and Rowell's boss suggested that he reduce his hours, but Rowell did not because of financial constraints.[30] Rowell continued to show up for the full work day but would sit outside, nap during lunch hour, or rest at his desk without working.[31] Rowell inquired about applying for disability, but was told that he was not eligible because disability was for "serious injuries" or

---

[23] All facts cited herein are taken from the administrative record ("AR") unless otherwise noted.

[24] AR 930.

[25] *Id.* 921, 925, 49, 5.

[26] *Id.* 922.

[27] *Id.*  290.

[28] *Id.* 921-22, 925.

[29] *Id.* 870-72.

[30] *Id.* 812.

[31] *Id.* 812, 1053

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

"blue collar" workers.[32] Rowell was terminated on August 18, 2007 as part of a reduction in force.[33] Rowell believes that he was terminated in part due to his poor performance as a result of his symptoms.[34]

**B.    ROWELL'S MEDICAL HISTORY AND PROOF OF DISABILITY PRIOR TO APPROVAL OF DISABILITY BENEFITS**

In early 2006, Rowell experienced dizziness, lightheadedness, nausea, and difficulty concentrating, especially when working at the computer for an extended period of time.[35] He consulted with several health professionals, including an optometrist and neurologist, in order to try to determine the source of his symptoms.[36] Medical records from March 2006 to March 2007 report ongoing symptoms of dizziness, seizures, chest pain and palpitations, back pain, and headaches.[37] In August 2006, Rowell was prescribed testosterone which afforded some improvement.[38] In January 2007, Dr. Mohammed Ahmed prescribed Keppra for Rowell's dizziness, which he discontinued due to tiredness.[39] The ergonomic assessment conducted by Aviza in May 2007 reported on Rowell's symptoms and advised him to return to his neurologist, re-attempt medication with Keppra, and repeat an optometry examination.[40] Between July 12, 2007 and December 5, 2007, Rowell underwent additional diagnostic tests for his symptoms.[41] Rowell did not receive a conclusive diagnosis.[42]

---

[32] *Id.* 812.

[33] *Id.* 921-22, 925.

[34] *Id.* 1053, 422.

[35] *Id.* 871.

[36] *Id.* 871, 875, 876.

[37] *Id.* 6.

[38] *Id.* 1034.

[39] *Id.* 888.

[40] *Id.* 6, 871.

[41] *Id.* 6-7.

[42] *See id.*

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
For the Northern District of California

On December 12, 2007, Dr. Leslie Dorfman examined Rowell concerning his neurological problems and reviewed his medical history and neurological exam results from the past year. Dr. Dorfman found that Rowell best fit a diagnosis of chronic fatigue syndrome ("CFS") linked with chronic relapsing depressive illness.[43] Dr. Dorfman referred Rowell to Dr. Jose Montoya of infectious diseases who was working on trial therapies for CFS.[44] In July 2008, Dr. Montoya connected Rowell's CFS diagnosis with blood test results showing heightened levels of Chalmydophila pneumonia bacteria, as well as Epstein Barr virus.[45] Dr. Montoya opined that Rowell's chronic fatigue was related to his infectious disease levels.[46] Dr. Montoya prescribed antibiotics which resulted in improvements in Rowell's energy level and mental clarity.[47]

Rowell's primary care physician, Dr. Dan Hopner, agreed with Dr. Montoya's diagnosis and noted limitations in the form of vertigo and fatigue after more than 30 minutes of sustained activity such as walking, keyboard use, or driving.[48] In a "Physical Capacities Evaluation" conducted by Dr. Hopner in September 2008, Dr. Hopner stated that Rowell could sit, stand and walk for 30-60 minutes each for 1 to 2 hours per day, and can "do anything for a limited time, as long as he is well rested. He will need 3 or 4 days bed rest if not well rested."[49]

From May to July 2008, Rowell also underwent psychotherapy treatment with Dr. Cheri Wheeler. Dr. Wheeler found that Rowell exhibited major depressive disorder and general anxiety disorder, poor memory and impaired concentration, and great difficulty relating in the workplace.[50] Dr. Wheeler also noted Rowell's poor physical stamina while exhibiting CFS.[51]

---

[43] *Id.* 7-9, 432.

[44] *Id.* 433.

[45] *Id.* 1182, 594-97.

[46] *Id.* 1182.

[47] *Id.* 1054, 1182.

[48] *Id.* 919-20.

[49] *Id.* 586-87.

[50] *Id.* 604, 616, 1044-46.

8

**C.     HISTORY OF DISABILITY BENEFITS**

Before applying for disability benefits through Aviza, Rowell applied and was approved for Social Security disability benefits in July 2008, retroactive to February 2008.[52]

During the relevant period of his employment, Rowell was insured by the Aviza Technology Health and Welfare Plan ("the Plan"), issued by Hartford to Aviza and effective January 1, 2007.[53] The Plan provides LTD, life, supplemental life, and accidental death & dismemberment insurance benefits to eligible employees. Under the Plan, Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions."[54] Although Aviza was named as the Plan's administrator, Hartford retained full authority and discretion to review employee claims.[55]

The Plan provides for LTD benefits to be paid at 66 2/3% of pre-disability earnings to normal retirement age, as defined by the Plan and subject to an elimination period of 180 days.[56] Normal retirement age for Rowell is 67.[57] "Disability" is defined in relevant part as sickness or mental illness which prevents the insured from performing "one or more of the essential duties of your occupation" during the 180 day elimination period and for the next 24 months.[58] "Your occupation" refers to the insured's occupation as it is recognized in the general workplace.[59] An "essential duty" is further defined as a duty that "(1) is substantial, not incidental; (2) is fundamental or inherent to the occupation; (3) cannot be readily omitted or changed," and

---

[51] *Id.* 616.

[52] *Id.* 501.

[53] *Id.* 1396-97.

[54] *Id.* 1408, 1428.

[55] *See id.* 1439.

[56] *Id.* 1397-98.

[57] *Id.* 1398; Docket No. 66 at 4 (Def.'s Mot. for Judgment Under Fed. R. Civ. P. 52).

[58] *Id.* 1408.

[59] *Id.* 1411.

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
For the Northern District of California

includes being at work "for the number of hours in your regularly scheduled workweek."[60] After the 24-month period, LTD benefits are provided only if the same terms are met with respect to "any occupation," defined as an occupation for which the insured is qualified by education, training or experience, and that has an earnings potential greater than 60% of an indexed, pre-disability earnings amount.[61]

The Plan also provides for a life insurance waiver of premium benefit which defines "disability" under a broader "any occupation" standard. The waiver of premium benefit is thus available if the disability "prevents you from doing any work for which you are or could become qualified by education, training or experience."[62]

Rowell submitted his initial disability claim in July 2008, alleging disability beginning August 16, 2007.[63] Rowell's description of his symptoms reads, "dizzyness [sic], nausea, lightheadedness, fatigue" and "difficulty remembering and concentrating not so bad that I'm 'unable' to do common tasks."[64] Dr. Hopner completed the Attending Physician's Statement for the initial disability claim. He indicated a primary diagnosis of "Chronic Fatigue Immune Deficiency Syndrome" and secondary diagnosis of Vertigo, and described Rowell's symptoms as "vertigo, fatigue."[65]

Aviza responded to Rowell's application and informed Hartford that Rowell had been laid off as part of a reduction in force, not due to disability or inability to work, and thus should not be eligible for disability benefits.[66] In its investigation of Rowell's claim, Hartford obtained medical records, including those from Rowell's consultations with Drs. Ahmed, Hopner,

---

[60] *Id.* 1409.

[61] *Id.* 1408, 09.

[62] *Id.* 1426.

[63] *Id.* 931.

[64] *Id.* 930-31.

[65] *Id.* 918-19.

[66] *Id.* 921-22.

10

Dorfman, Wheeler, and Montoya, and reviewed Rowell's ergonomic assessment by Aviza in May 2007.[67] Both Hartford examiners recommended approval of Rowell's LTD claim. The first noted that:

> The limitations are supported by Dr. Hopner's evaluation of [Rowell's] condition which indicates that he is limited in all activities to 30-60 minutes up to 1-2 hours max per day. [Rowell] needs rest. Current treatment plan includes an antibiotic prescribed by Stanford Medical Center for a virus, and rest. *** [Rowell] has contacted multiple doctors who have done extensive testing on [him]. It is reasonable to conclude that if [he] is limited to his excessive need for rest due to CFS then he cannot maintain job duties as a Designer, because he would need to rest after every 30-60 minutes of concentration.[68]

The second examiner agreed, noting that Rowell's "medical records are consistent with ongoing treatment of [his] complaints and [his] later diagnosis with chronic fatigue."[69] The examiner added, "Although [Rowell] does have some work ability, he has a reduction in his stamina and inability to maintain focus for a full day of work activity."[70]

On September 19, 2008, Hartford sent an approval letter to Rowell indicating that he had been approved for LTD benefits beginning February 15, 2008. Hartford identified Rowell's disability date as August 19, 2007.[71] On August 4, 2008, however, Hartford informed Rowell that his waiver of life insurance premium benefit was denied because the records indicated that he had not stopped working due to being disabled under the required "any occupation" standard.[72] Rowell appealed the denial determination.[73]

---

[67] *Id.* 53-54.

[68] *Id.* 54.

[69] *Id.* 55.

[70] *Id.*

[71] *Id.* 155-58.

[72] *Id.* 1172-73.

[73] *Id.* 1171.

11

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

Hartford initiated a review of the premium waiver claim and requested independent peer review by two physicians from the University Disability Consortium ("UDC").[74] The UDC physicians, Dr. Olander and Dr. Marks, conducted independent medical record reviews and spoke with several of Rowell's treating physicians from 2006-2008. Neuropsychologist Dr. Olander found that other than the period of late May and June 2008, the medical record evidence did not support an inability to work full-time, although "[he] would probably benefit from a work situation that does not place extensive interpersonal demands on him."[75] Dr. Marks found that there were "no actual anatomic pathologic findings … to explain [Rowell's] clinical presentation that would account for an inability to perform the activities of work."[76] With respect to the diagnosis of infection induced fatigue, Dr. Marks noted Rowell's apparent improvement in response to antibiotic therapy as documented by Dr. Montoya in his last consultation with Rowell in September 2008. Dr. Marks concluded that although he could not ascertain the severity of Rowell's fatigue symptoms while he received treatment, there were no records after September 2008 that would indicate physical preclusion from full-time work.[77]

Hartford thus determined that waiver of premium benefit was appropriate for a "closed period" from August 19, 2007 through September 2008, but not from October 2008 forward.[78] On March 31, 2009 Hartford upheld the denial of Rowell's life insurance waiver of premium benefit.[79] Rowell sought to appeal this second denial of his waiver benefit.[80] Hartford denied the request on the ground that ERISA allows only one appeal review, which Rowell had exhausted.[81]

---

[74] *Id.* 439.

[75] *Id.* 440.

[76] *Id.* 441.

[77] *Id.*

[78] *Id.* 442, 1169.

[79] *Id.* 1165-69.

[80] *Id.* 422-23.

[81] *Id.* 1164.

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

D.     ROWELL'S HEALTH BETWEEN APPROVAL OF HIS CLAIM AND SUBSEQUENT TERMINATION OF HIS BENEFITS

In February 2009, Rowell wrote to Hartford with an update on his health and activities.[82] He informed Hartford that his health status remained unchanged and his daily activity level varied considerably depending on factors such as sleep, overexertion, and diet.[83] Rowell further informed Hartford that he had begun to see Dr. Michael Powell, rheumatologist with the Fibromyalgia Treatment and Learning Center, in Sacramento, CA, for his chronic fatigue, as well as a local, primary care physician since Rowell's move to a different city.[84]

On February 25, 2009, Hartford referred Rowell's claim to the special investigations unit ("SIU"), which twice conducted surveillance on Rowell for two consecutive days each in March 2009.[85] Surveillance reported that Rowell left his house on only three of the four days. On days one and two, surveillance observed Rowell leaving the house, driving nearby to the bank, gas station, and grocery store, and returning home in less than three hours.[86] On day three, Rowell was not observed leaving his house. On the fourth day, Rowell left only to drive 45 minutes to a hiking trail with his two dogs and returned to his car at the trailhead about one hour later.[87]

On April 13, 2009 the SIU reported to Hartford that it "has completed its investigation and has been unable to identify any evidence warranting continued investigation."[88] Yet on April 29, 2009, Hartford informed Rowell that although the March 31, 2009 wavier of premium denial decision was based on a different policy and definition of disability, Hartford had decided to close his LTD claim because it did not see medical support for disability based on the "own

---

[82] *Id.* 469.

[83] *Id.*

[84] *Id.*

[85] *Id.* 298-315.

[86] *Id.* 299-307.

[87] *Id.* 308-314.

[88] *Id.* 40.

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

occupation" standard.[89] Rowell responded that Hartford should speak with Dr. Powell in Sacramento, and Hartford agreed to suspend action against the LTD so that Rowell could submit Dr. Powell's information.[90]

The records submitted by Dr. Powell in May 2009 indicate Rowell's treatment beginning in January 2009 for chronic fatigue syndrome and use of antibiotics to address Rowell's ongoing infection.[91] Dr. Powell described Rowell as physically limited to sitting 2-5 hours, and standing and walking ½-2 hours each per day, and as cognitively impaired in his processing, concentration, and memory. Dr. Powell's treatment plan noted that addressing infection usually restores normal function in CFS patients and that he expected Rowell's restrictions to endure another four months based on effective treatment.[92] Dr. Powell also responded to Hartford's request to review and comment on the March 2009 reviews by Dr. Olander and Dr. Marks,[93] stating that he did not agree with their assessment of Rowell's condition.[94] Rowell also submitted a claimant questionnaire and additional, written statement detailing his medications, routines and energy levels.[95]

Citing the "new information from" Dr. Powell, Hartford's claim file in June 2009 states that Rowell's disability claim under the own occupation standard continues to be supported.[96] Yet in September 2009, Hartford arranged for an investigator to interview Rowell at his home and go over the information in his claim file.[97] Rowell submitted another written statement

---

[89] *Id.* 39.

[90] *Id.* 38, 39.

[91] *Id.* 409-412.

[92] *Id.* 403-404.

[93] *Id.* 380. These two reviewing physicians are the same who reviewed Rowell's claims under the life insurance policy.

[94] *Id.*

[95] *Id.* 374-79.

[96] *Id.* 32.

[97] *Id.* 1265.

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

before the interview. It repeats similar information to that in his statement from May 2009. The letter also advises Hartford that due to his "cognitive dysfunction," he has difficulty communicating verbally and remembering and processing information, and requests that the interviewer review his letter ahead of time and consider it his best effort to describe his activities and health.[98]

The interview on October 1, 2009 lasted for two and a half hours.[99] The interviewer noted that Rowell did not display any cognitive problems.[100] The interviewer also noted that Rowell "was too tired to read and review his statement" at the end of the interview, but agreed to review the statement, make any changes, and sign it at a later time.[101] Rowell states that he was so exhausted at the end of the interview that it took him sixteen days to edit the statement, including those sections in which the interviewer misrepresented information, and to send it back.[102]

A Hartford claims examiner noted that Rowell's activities, as observed during the surveillance, included "bending at the waist, driving, carrying assorted items, holding the leash of two dogs, and walking in a normal manner, without assistive devices and without any apparent restrictions and limitations," and with "no indication that [Rowell] was fatigued," which appeared to be inconsistent with Rowell's reported impairment.[103] The examiner referred the file to a medical case manager for review of Rowell's limitations and restrictions.[104] After reviewing and summarizing in detail the information from Rowell's file, the medical case manager opined that Rowell was capable of functioning up to 40 hours per week within certain parameters.[105]

---

[98] *Id.* 334.

[99] *Id.* 316.

[100] *Id.* 317.

[101] *Id.* 317-18.

[102] *Id.* 1053.

[103] *Id.* 28.

[104] *Id.*

[105] *Id.* 25-26.

15

1    Hartford contacted Dr. Powell to inform him of its findings and to seek his opinion.[106] Dr. Powell

2    disagreed and recommended that Hartford cover the cost of neuropsychiatric testing for Rowell.

3    Dr. Powell also noted that low-impact exercise is part of the treatment for CFS, and that Rowell's

4    ability to take walks does not mean he can function adequately to work.[107]

5         Hartford referred Rowell's file to MES Solutions ("MES") for independent review. MES

6    inquired whether Rowell had had any neuropsychiatric testing, and Hartford confirmed that he

7    had not.[108] MES psychologist Joseph Ricker reviewed Rowell's medical records and the SUI

8    surveillance video, and spoke with Dr. Powell. Dr. Ricker noted the absence of any formal

9    neuropsychological testing, including by Rowell's former psychologist, Dr. Wheeler, and

10   concluded that he had seen no evidence of "disabling cognitive or emotional impairment."[109] Dr.

11   Ricker focused specifically on the absence of "objective/clinical evidence of functional

12   impairment due to cognitive or emotional issues" and the fact that Rowell's claims are "self-

13   reported" and unsubstantiated by any "formal testing."[110] The second MES physician, Dr.

14   Brusch, similarly reviewed the medical records, surveillance video, and spoke with Dr. Powell.

15   Dr. Brusch concluded that Rowell "does not have any definable or diagnosed illness that would

16   cause him to be impaired. He does not meet the criteria of chronic fatigue."[111] He opined that

17   Rowell can work 40 hours a week.[112] Dr. Brusch based his conclusion on "the fact that on

18   multiple physical and neurological exams that he has undergone, there has never been any

19   significant abnormality found," as well as on Rowell's appearance as a "normally functioning

20

21

22   _____
     [106] *Id.* 251.

23   [107] *Id.*

24   [108] *Id.* 260-61.

25   [109] *Id.* 241-44.

26   [110] *Id.* 244.

27   [111] *Id.* 245-47.

28   [112] *Id.* 246.

man" in the video surveillance and his ability to talk, answer questions and follow instructions for 2 ½ hours during the October 1, 2012 interview.[113]

Hartford determined on December 7, 2009 that Rowell was capable of sedentary to light duty work, 40 hours per week, including sitting, standing and walking without restriction, but with the capacity to change positions and postures as needed.[114] Rowell's position as a designer was sedentary. Hartford therefore sent a detailed letter informing Rowell of its review and of termination of his claim as of December 22, 2009.[115]

On June 17, 2010, Rowell appealed the termination of his LTD benefits.[116] Rowell's letter of appeal summarized his medical history and records from Dr. Powell, Dr. Wheeler, and older records from 2006 to demonstrate Rowell's long history of fatigue symptoms. It also included a declaration from Rowell with a daily activity diary dated September 11, 2009 – January 26, 2010.[117] In his appeal, Rowell argues that the opinions of the reviewing physicians from UDC and MES that there was no objective evidence to support Rowell's claim is "at odds with the facts."[118] These facts include:

- Rowell's "persistent Chlamydia pneumonia infection in spite of long-term antibiotic therapy," as documented in the records of Drs. Montoya and Powell, "urine lead level 300% of normal," and testing conducted in February 2008 that showed signs "consistent with Rowell's complaint of dizziness;"

- Rowell's extremely limited activity level as captured by the surveillance video;

- Rowell's problems with concentration and memory, as documented by the medical records of several different physicians;

- Rowell's own testimony and activities diary.[119]

---

[113] Id.

[114] Id. 19.

[115] Id. 224-36.

[116] Id. 1010-1014.

[117] Id. 1053-71.

[118] Id. 1013.

[119] Id.

17

United States District Court
For the Northern District of California

In response to Rowell's appeal, Hartford referred the claim for additional peer reviews to physicians with Behavioral Medical Intervention ("BMI").[120] BMI physician Dr. MacGuire reviewed the file and spoke with Dr. Powell and Dr. Warner, Rowell's new internal medicine doctor who had seen Rowell only one time.[121] Dr. Warner had no information to provide. From her conversation with Dr. Powell, Dr. MacGuire reported that:

- Rowell "had no clinical functional musculoskeletal conditions such as loss of range of motion, synovitis, specific physical neurologic abnormalities, or other findings that would restrict his activities;"

- Rowell's "issues are more likely psychiatric than physical and [Dr. Powell] is very hopeful the psychiatric evaluation will support [Rowell's] inability to work full-time;"

- Rowell "is independent in all activities of daily living" and "does have complaints of significant fatigue;" and

- Rowell "has a fair amount of somatic complaints, but [Dr. Powell] is concerned that there may be a physical issue that has not been fully uncovered at this time."[122]

Dr. MacGuire summarized Rowell's history as that of "fibromyalgia and chronic fatigue syndrome since 1/16/2006" and vertigo.[123] She noted that Rowell is able to travel, drive to the gym, engage in various activities, and manage property. She also noted that the surveillance video documented no "obvious physical limitations for walking, standing, and driving." From her review of the records and largely negative or "unremarkable" test results and her conversation with Dr. Powell, Dr. MacGuire concluded that Rowell presented no evidence of a "clinical functional musculoskeletal condition" that would limit him from occupational activities or support his claim of ongoing fatigue.[124]

BMI neuropsychologist Dr. Raymond noted the consistent but "somewhat vague" neurological symptoms including dizziness, headaches, and "cognitive alterations" such as poor

---

[120] *Id.* 975.

[121] *Id.* 968-69.

[122] *Id.* 969-70.

[123] *Id.* 972.

[124] *Id.* 972-73.

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

focus, and the negative and nondiagnostic neurological tests that Rowell underwent at various times in 2006 and 2007.[125] Dr. Raymond concluded that from a neuropsychological perspective, "there is no clinical evidence to support neurocognitive alterations which would preclude [Rowell] from returning to gainful employment. [Rowell's] cognitive symptoms including reduced concentration and memory are merely self-reported."[126] Dr. Raymond further noted that that Rowell had not undergone any formal neuropsychological assessment or cognitive testing.

In Hartford's review of Rowell's file on appeal, it referred to the initial award of LTD benefits based on "dizziness, vertigo and chronic fatigue" and the termination of benefits based on "SIU surveillance and co-morbid MES report."[127] The appeal considered Rowell's submission of additional medical documentation regarding his fatigue, antibiotic treatment, elevated urine lead levels, and energy level and cognitive function at approximately 50% and 30% of normal, and noted that no documentation was submitted in support of Rowell's cognitive complaints.[128] Hartford also reviewed the conclusions of BMI reviewers Dr. MacGuire and Dr. Raymond. Hartford again concluded that Rowell had no neuropsychological impairments or functional musculoskeletal restrictions that would keep him from returning to his occupation as a mechanical designer.[129] On August 23, 2010, Hartford denied Rowell's appeal.[130]

On October 14, 2010, Rowell requested that Hartford re-open the appeal to consider an additional statement from Dr. Powell that sought to correct inaccuracies in Dr. MacGuire's summary of her conversation with Dr. Powell.[131] Hartford agreed to forward Dr. Powell's comments to Dr. MacGuire at BMI, and to provide an addendum report.[132]

---

[125] *Id.* 970-71.

[126] *Id.* 972.

[127] *Id.* 10.

[128] *Id.*

[129] *Id.* 11.

[130] *Id.* 206-11.

[131] *Id.* 196.

[132] *Id.* 192.

19

Dr. Powell's statement pointed out several inaccuracies in Dr. MacGuire's report:

> Dr. MacGuire repeatedly invited me to say that Mr. Rowell's problems were purely psychological in nature. I told her each time she mentioned this possibility that Mr. Rowell has a physical condition that includes lead accumulation and chronic infection with Clamydophia pneumonia, both of which can impair cognitive function. *** I repeated … that if [Hartford] wants to dispute the diagnoses of cognitive impairment, then they are obligated to pay for the neuropsychiatric testing or SPECT scan testing to prove that they are normal. ***

> When Dr. MacGuire says that I told her that there is no physical evidence of cognitive or neurologic impairment, please translate that to: 'Dr. Powell says that there is no question that Mr. Rowell has significant cognitive impairment, including the physical symptoms of uncontrollable nystagmus impairing eye contact, which is improving with treatment.' When she says I told her the condition is mostly psychological, please translate that to Dr. MacGuire saying: 'Wouldn't you say that Mr. Rowell's condition is psychological? And my saying: 'No.' Then her saying: 'But don't you think there is a psychological component?' and my saying: 'There is often a psychological component to physical illness,' followed by my recommending again that the neuropsychiatric and or SPECT scans be performed if there is any question about the validity of the claims.

BMI responded to Hartford's follow-up inquiry with an addendum from Dr. MacGuire, stating:

> It is clear from the record that multiple physicians have evaluated this claimant and have determined he has no significant problem from nystagmus. I stand by my original impression that this individual does not have a validating functional musculoskeletal condition that would limit him from occupational activities. The additional information does not change my opinion.[133]

On November 9, 2010, Hartford informed Rowell that it was upholding its prior decision on appeal.[134]

From the time of his initial claim for benefits to Hartford's termination and appeal decisions, Rowell's self-reported symptoms have remained largely unchanged, particularly as to fatigue and impaired ability to communicate, concentrate, and recollect, especially under certain conditions or after a period of exertion.[135] Since early 2006, Rowell has complained of these symptoms and sought out various forms of testing and treatment. The initial claim examination by Hartford recognized that

---

[133] *Id.* 189-90.

[134] *Id.* 184-85.

[135] *See* AR 930-31 (initial benefits claim form); 374-79 (5/27/09 statement documenting health status); 334-341 (9/12/09 statement documenting health status).

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
For the Northern District of California

1   Rowell's symptoms and complaints indicated reduced capacity to function – "inability to maintain

2   focus for a full day of work activity" – not an altogether inability to function.[136]

3          Both the MES and BMI reviewing physicians relied heavily on the absence of formal test

4   results to support Rowell's neuropsychological as well as physical complaints. The physicians were

5   skeptical of Rowell's self-reported symptoms as unsupported by clinical results. Their reviews did

6   not address Dr. Powell's clinical assessment regarding ongoing infection levels, high blood lead

7   levels, and the likely symptomatic and cognitive effects of those conditions. The MES and BMI

8   reviewers also cited Rowell's ability to walk, carry items, and drive without restriction while under

9   surveillance, and to participate in a 2 ½ hour interview with Hartford's investigator. The reviewers

10  did not remark on the limited hours each day in which Rowell's activity took place, or the day in

11  which he never left his house, nor on the investigator's notes at the end of the interview stating that

12  Rowell was too tired to read and sign his own statement.

13         Insofar as Rowell's initial symptoms and attempts to get treatment indicated a reduced

14  capacity to function, the court find those symptoms to have persisted and remained consistent

15  through the course of Hartford's reviews of Rowell's claims.

16                              **IV.    CONCLUSIONS OF LAW**

17  **A.    LEGAL STANDARD**

18         ERISA provides for judicial review of a decision to deny benefits to an ERISA plan

19  beneficiary.[137] The standard of review in an ERISA appeal depends on whether the plan at issue

20  grants discretion to the administrator.[138] Where the benefit plan gives the administrator discretionary

21  authority to determine eligibility for benefits or to construe the terms of the plan, the court will

22  review for abuse of discretion.[139] Otherwise, *de novo* is the default standard of review.[140]

23

24  [136] *Id.* at 55.

25  [137] *See* 29 U.S.C. § 1132(a)(1)(B).

26  [138] *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

27  [139] *Id.*

28  [140] *Abatie,* 458 F.3d at 963 (citing *Firestone Tire & Rubber Co.* at 115).

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
For the Northern District of California

Where, as here, the administrator has offered to stipulate to *de novo* review and the claimant does not object, the court will review the case *de novo*.[141] Accordingly, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits, without reference to whether the administrator operated under a conflict of interest."[142] On *de novo* review, it is the plaintiff's burden of proof to establish that she was disabled under the meaning of the plan.[143] Moreover, "the burden of proof continues to lie with the plaintiff when disability benefits are terminated after an initial grant."[144]

**B.    TERMS OF THE PLAN**

On *de novo* review, the court interprets the plan by looking "first to the terms of the Plan itself."[145] Interpretation of the Plan derives from state law contract principles.[146] As such, the terms of the Plan should be interpreted according to their ordinary meaning and in the context of the entire document.[147] Ambiguities in the policy terms should be construed against the insurer.[148]

There is no dispute between the parties regarding the meaning of the Plan terms. Under the Plan, at the time that Hartford terminated Rowell's LTD benefits and denied his appeal of its termination decision, Rowell had to be prevented by disability "from  performing one or more of the

---

[141] *See* Docket No. 63 at 11, n.4 (Pl.'s Mot. for Judgment Under Fed. R. Civ. P. 52) (noting that although the stipulation between the parties to *de novo* review ultimately failed, the court may interpret Hartford's position as having conceded *de novo* review).

[142] *Abatie*, 458 F.3d at 963. *See also Muniz v. Amec Constr. Mgmt, Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010) ("When conducting a de novo review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan.")

[143] *Muniz*, 623 F.3d at 1294 (noting with approval that district courts within this circuit "have consistently held that the burden of proof remains with the claimant when the court reviews a plan administrator's decision under the de novo standard of review"). *See also Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F.Supp.2d 1222, 1232 (N.D. Cal. 2003); *Heighley v. J.C. Penney Life Ins.*, 257 F. Supp. 2d 1241 (C.D. Cal. 2003).

[144] *Muniz*, 623 F.3d at 1296.

[145] *See Nelson v. EG & G Measurements Group, Inc.*, 37 F.3d 1384, 1389 (9th Cir. 1994).

[146] *See Gilliam v. Nevada Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007).

[147] *Id.*

[148] *See Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 539-41 (9th Cir. 1990).

22

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
For the Northern District of California

1 | essential duties" of his occupation.[149] "Essential duty" simply means a duty that is substantial or

2 | fundamental to the occupation and cannot be readily omitted or changed. It includes being at work

3 | for the number of regularly scheduled hours.[150] The "your occupation" standard refers to the

4 | occupation as it is generally recognized in the workplace and does not refer specifically to the job as

5 | performed for a specific employer at a specific location.[151]

6 |      Rowell contends, and Hartford does not dispute, that Rowell's occupation as a mechanical

7 | designer with Aviza required forty hours a week, about 80 percent of which was spent on the

8 | computer. In order to evaluate Hartford's termination of Rowell's LTD benefits, the court thus

9 | determines whether Hartford was correct or incorrect in finding that Rowell could perform the

10 | essential duties of his occupation as a mechanical designer for at least forty hours each week. In

11 | contrast, with respect to the termination of Rowell's life insurance waiver of premium benefit, the

12 | court evaluates whether Hartford's decision was correct or incorrect regarding Rowell's ability to

13 | under the "any occupation" standard, requiring an inability to do any work for which he is or could

14 | become qualified by education, training, or experience.[152]

15 | **C.    PROOF OF DISABILITY**

16 |      Having reviewed the administrative record and considered the argument of counsel on both

17 | sides, the court finds that Hartford's decision to terminate Rowell's LTD benefits under the "your

18 | occupation" standard of the Plan was in error because it represents an illogical departure from

19 | Hartford's earlier findings that does not flow from the medical or other evidence. Hartford's decision

20 | regarding the life insurance waiver of premium benefit under the "any occupation" standard,

21 | however, also was in error. The medical evidence was insufficient to support a conclusion that

22 | Rowell could perform the essential duties of any occupation.

---

[149] *See* AR 1408.

[150] *See id.* 1409.

[151] *See id.* 1411.

[152] *See id.* 1426.

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1         The court bases its conclusion on the following: (1) Rowell's symptoms and diagnosis of

2   CFS remained largely unchanged between the time of Hartford's finding of disability under the

3   terms of the Plan and its termination decision, and Hartford fails to adequately explain the basis for

4   its reversal; (2) Hartford's reliance on the opinions of reviewing physicians regarding the lack of

5   objective evidence or clinical proof of Rowell's CFS is erroneous because the Ninth Circuit has

6   rejected a requirement of objective indicia for CFS; (3) Hartford has misconstrued the results of its

7   investigative interview and surveillance to be inconsistent with Rowell's reported symptoms or

8   functional capacity; (4) Hartford improperly discounts the 2008 social security disability award

9   without explanation; and (5) the evidence does not support termination of LTD benefits under the

10   "your occupation" standard set by the Plan or the life insurance waiver under an "any occupation"

11   standard.

12        *1.   Medical Evidence of Rowell's Disability*

13         As described in the findings of fact, in September 2008, Hartford approved Rowell's initial

14   disability claim based on the medical record evidence supplied by Rowell and his attending and

15   consulting physicians at the time. Although none of these physicians had an objective test to confirm

16   what eventually came to be a CFS diagnosis, both of Hartford's claim examiners accepted the

17   doctors' diagnosis of CFS and found that Rowell's resulting limitations precluded him from

18   maintaining his job duties as a designer because "he would need to rest after every 30-60 minutes of

19   concentration"[153] and "he has a reduction in his stamina and an inability to maintain focus for a full

20   day of work activity."[154] The recommendation for approval of Rowell's claim came notwithstanding

21   the claim examiner's notation that Rowell "can do anything for a limited time, as long as he is well

22   rested."[155] The other claim examiner noted that the medical records are consistent with Rowell's

23   complaints and his CFS diagnosis, including having an overall functional ability to work less than

24   eight hours per day.[156]

---

25   [153] *Id.* 54.

26   [154] *Id.* 55.

27   [155] *See id.* 54

28   [156] *See id.* 55.

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

Between this initial assessment by Hartford's LTD claim examiners and the final termination decision, the record does not convey a change in diagnosis or a notable improvement in Rowell's symptoms. For example, in July 2008, Dr. Montoya related Rowell's CFS diagnosis to ongoing infection and prescribed antibiotics, which resulted in some improvement in energy level and mental clarity.[157] Dr. Hopner, Rowell's attending physician at the time, agreed with the diagnosis.[158] Based on his psychological consultations with Dr. Wheeler in 2008, Rowell's medical records also established moderate impairments in Rowell's cognitive functioning, particularly memory and concentration, as well as depression and difficulty relating in the workplace.[159]

Beginning in January 2009 under the treatment of Dr. Powell, Rowell continued antibiotic therapy yet continued to test at significantly elevated levels for chlamydia pneumonia.[160] Dr. Powell reported that Rowell has responded partially to antibiotic therapy, but developed a drug side effect that required the therapy to be discontinued.[161] Dr. Powell also reported some modest improvements to Rowell's physical symptoms but confirmed that Rowell continued to suffer from fatigue and reduced mental function and stamina. In June 2010, Powell estimated Rowell's capacity to be around 50% of his normal energy level and 30% of his normal cognitive level.[162] In order to confirm Rowell's cognitive function with a more accurate and objective measure, Dr. Powell recommended a neuropsychiatric test, but no such test was conducted.

Rowell's self-reporting of his symptoms and capacity to function also remained consistent during the time period in question. Rowell updated Hartford multiple times regarding his daily

---

[157] *See id.* 1182.

[158] *See id.* 919.

[159] *Id.* 616, 1044.

[160] *Id.* 415, 1028, 1022.

[161] *Id.* 1022.

[162] *Id.*

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
For the Northern District of California

1    activities and limitations as well as his symptoms, including fatigue, vertigo, and mental exhaustion

2    and inability to concentrate or communicate, resulting from certain activities in particular.[163]

3           The medical evidence pertaining to Rowell's diagnosis of CFS, chronic infection, and

4    cognitive impairments thus did not change between Rowell's early diagnosis in 2008 and the 2009

5    medical reports. Neither Dr. Hopner nor Dr. Powell conducted an objective examination for CFS;

6    yet both concluded that Rowell had CFS and that it limited his functional capacity, probably in

7    conjunction with psychological factors. Not one doctor who personally examined Rowell raised a

8    doubt as to his reduced functional capacity or disputed his CFS diagnosis,[164] although several who

9    examined Rowell before his CFS diagnosis were unable to identify a physical basis for his fatigue

10   and other symptoms. The 2009 medical records present essentially the same set of conditions that

11   Hartford found to be disabling under the Plan's "own occupation" standard in 2008 and therefore

12   continue to support Hartford's initial finding. In combination with the additional factors outlined

13   below, Hartford's termination decision does not logically flow from the evidence presented by

14   Rowell's actual medical records and his own statements to Hartford.

15           *2.   UDC, MES, and BMI Review of the Medical Evidence*

16           As discussed above, among the physicians who actually examined and treated Rowell, none

17   discredited his symptoms or offered an unqualified opinion that he was able to work in the same

18   capacity that he had before. Rowell's treating physicians agreed with the CFS diagnosis and found

19   his physical and mental capacity to be compromised by fatigue and certain cognitive impairments.

20   As opposed to the physicians who personally treated Rowell, the physicians commissioned by

21   Hartford to review Rowell's file generally concluded that Rowell's disability was unsupported by

22   objective medical evidence. For example, in the review conducted by the UDC physicians in

23   response to Rowell's appeal of his life insurance waiver of premium benefit denial, Dr. Marks found

24   that "there were no actual anatomic pathologic findings on examination or imaging studies to explain

25   the claimant's clinical presentation" and concluded that diagnoses of migraine dizziness and

26

27   [163] *See, e.g.*, AR 334-341, 374-79, 469, 930-31.

28   [164] *Cf. Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011).

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
For the Northern District of California

infectious induced fatigue were not sufficiently compelling or supported to find Rowell to be physical precluded from full-time work.[165] MES neuropsychologist Dr. Ricker similarly reported the lack of "objective/clinical evidence of functional impairment due to cognitive or emotional issues,"[166] and MES physician Dr. Brusch based his conclusion in part on the results of "the multiple physical and neurological exams" that Rowell underwent and which uncovered no significant abnormality.[167] Finally, BMI neuropsychologist Dr. Raymond relied on the absence of "clinical evidence" from various neurological examinations that Rowell underwent, including EEG and ambulatory EEG, cerebral CDT scan, MRI, and visual evoked response.[168] BMI rheumatologist Dr. MacGuire listed the unremarkable results of these and other laboratory studies and evaluations – although she does not reference the infection levels documented by Dr. Montoya and Dr. Powell – and concluded that they "have failed to provide a musculoskeletal disorder that would support" Rowell's ongoing complaint of fatigue.[169]

Both Hartford's December 23, 2009 letter decision terminating Rowell's benefits and Hartford's August 23, 2010 letter upholding its termination rely on the conclusions of the reviewing physicians regarding the absence of test results or clinical evidence to support Rowell's diagnosis.[170] But the fact that Hartford's reviewing physicians identified only limited objective or clinical evidence in the record to support Rowell's condition, despite extensive testing, is not an appropriate basis for Hartford's termination decision. In *Salomaa v. Honda Long Term Disability* Plan, the Ninth Circuit rejected the notion that CFS must present by certain "pathognomonic signs or diagnostic tests."[171] The court reviewed the accepted bases for a CFS diagnosis and confirmed that "[t]here is

---

[165] AR 466.

[166] *Id.* 244.

[167] *Id.* 246.

[168] *Id.* 970-71.

[169] *Id.* 973.

[170] *See id.* 100-111, 78-82.

[171] 642 F.3d 666, 677 (9th Cir. 2011).

United States District Court
For the Northern District of California

no blood test or other objective laboratory test for chronic fatigue syndrome."[172] Because CFS best fits within that class of medical conditions that may depend on patient reports of symptoms for their diagnosis, the court held that it would be improper for a disability insurer to "require proof by objective indicators such as blood tests where the condition is recognized yet no such proof is possible."[173] Hartford's reliance on these findings by its physician reviewers – insofar as they suggest that Rowell's disability claim is unsupported without such objective indicia as would result from laboratory or other testing techniques – thus is in error.

In addition, although Hartford need not "accord special deference to the opinions of treating physicians,"[174] neither may Hartford discredit reliable evidence without an adequate explanation. In contrast to the Supreme Court's admonishment that courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation,"[175] here Hartford has discredited reliable evidence based on the treating physicians' evaluations without directing the court to some other, at least equally reliable evidence that suggests sufficient functional capacity to perform the duties of Rowell's own occupation.

Finally, the opinion of reviewing BMI physician Dr. MacGuire provides an unreliable basis for Hartford to evaluate Rowell's disability claim for several reasons. First, after listing the medical records she reviewed and the treating physicians with whom she spoke. Dr. MacGuire misstates the basis for Rowell's claim: "Mark Powell (sic) is a 37-year-old male with a history of fibromyalgia and chronic fatigue syndrome since 1/16/06."[176] Second, Dr. MacGuire focuses on the absence of a musculoskeletal condition that would limit Rowell from occupational activities; she notes that the video surveillance failed to provide evidence "of any obvious physical limitations for walking, standing, and driving."[177] This assessment is at most tangential to Rowell's claim based on chronic

---

[172] *Id.*

[173] *See id.* at 678.

[174] *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (1965).

[175] *Id.* at 834.

[176] *See* AR 972.

[177] *Id.* 973.

United States District Court
For the Northern District of California

fatigue and cognitive factors that limit sustaining any one activity for more than a few hours but do not interfere with basic physical capability to walk, stand, drive, bend, or carry. Third, Dr. MacGuire reports several statements from her conversation with Dr. Powell that Dr. Powell disputes on the record, but as to which dispute Dr. MacGuire fails to address in her limited response, which states only that "I stand by my original impression that this individual does not have a validating functional musculoskeletal condition that would limit him from occupational activities."[178] Based on the apparent carelessness of Dr. MacGuire's reporting on her review of Rowell's file and her conversation with his treating physician, the reliability of her conclusion is largely discredited.

### 3. Interview and Surveillance Evidence of Functional Capacity

Hartford also based its termination decision on the "documented inconsistencies between [Rowell's] reported limitations and observed activities and the medical documentation provided" in his file.[179] The court, however, finds no inconsistencies between Rowell's reported limitations and the observations of Hartford's investigators. At no point was Rowell's disability claim based on physical incapacity to walk, sit, stand, or engage in any other activity for at least a limited period of time. The Physical Capacities Evaluation provided by Dr. Hopner, which Hartford relied on in its initial review of Rowell's claim, states that Rowell can sit, stand and walk for 30-60 minutes each for 1 to 2 hours per day, and can "do anything for a limited time, as long as he is well rested."[180] Rowell's own statements to Hartford reflect the same. For example, in his May 27, 2009 claimant questionnaire, Rowell explains, "I can do any physical thing, but only for a limited period of time without overexerting myself to the point where I need 1-4 days bed rest to recover."[181] In his September 29, 2009 letter to Hartford in preparation for the interview sought by Hartford, Rowell repeats the same statement and also explains his activity level and abilities in more detail:

---

[178] *See id.* 184.

[179] *Id.* 107.

[180] *See id.* 586-87.

[181] *Id.* 374.

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

> The amount of overall daily activity I can do depends on the task and how rested I am. It depends on the activity and the exertion level. *** Walking in the woods, or a place with total solitude is much easier for me, than walking down a hallway in a company building where I have to interact with coworkers. For awake activity, low stress stuff, I can do some awake activity 3-8 hours before napping. *** Awake activity can mean a combination of things including driving, using computer, sitting watching TV, cooking, reading, walking, qui-gong, going to the sauna, or a trip to the store, and sitting around. *** Physical activities/physical work could also include yard work like mowing pulling weeds, planting plants, painting, walking, standing, whatever, or 1-6 hrs on good days (I'm guessing and don't time myself). *** I can sit for 2-6 hours on good days. After that I get mentally drained and can't comprehend or stay present. A sustainable level may be 1-3 hours in a workplace without a lot of stress, using the phone, computer, talking to anybody for long periods, or trying to do mentally exertinal (sic) activities.[182]

During the interview, Rowell reported to the investigator that he can walk his dogs for a total of about forty-five minutes, stopping to rest periodically for about five minutes, and that he can walk enough to take care of daily activities, such as running errands and going to appointments.[183]

The surveillance conducted by Hartford reveals that on those days Rowell left his property at most once, or not at all, to run nearby errands such as to a store or gas station, or to exercise by walking or hiking with his dogs for about one hour. At most it demonstrates an ability to engage unrestricted in low-impact and undemanding activities for a few hours at a stretch. These activities do not contradict Rowell's claimed limitations and actually are consistent with his reports to Hartford. The conclusion of Hartford's claims examiner that Rowell's activities appear to be inconsistent with his claimed limitations because he was seen during surveillance "bending at the waist, driving, carrying assorted items, holding the leash of two dogs, and walking in a normal manner, without assistive devices and without any apparent restrictions and limitations" and with "no indication that [he] was fatigued" is simply illogical.[184] Hartford reiterated this conclusion in its letter of denial to Rowell, noting that during surveillance and the interview Rowell moved in an unrestricted manner, without indication of fatigue or pain. Yet according to Rowell's self-reported

---

[182] *Id.* 334-37.

[183] *Id.* 320.

[184] *See id.* 28.

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
For the Northern District of California

1   capabilities and limitations, none of these activities would be expected to result in observable

2   discomfort or fatigue when premised or followed by periods of rest.[185]

3       *4.  Social Security Disability Benefits*

4       Hartford's LTD termination decision also improperly fails to acknowledge Rowell's award

5   of social security disability ("SSD") benefits.[186] Only in reviewing Rowell's appeal does Hartford

6   state that it considered the SSD award along with the medical record and other evidence.[187] In its

7   briefing, Hartford argues that Rowell's receipt of SSD benefits is not helpful to his appeal because

8   its termination decision is based on evidence that the Social Security Administration may not have

9   had at the time that it granted SSD benefits, and because the standards and framework governing

10  SSD determinations – including the presumption that favors the opinion of a treating physician over

11  a reviewing physician – are not comparable to the framework under ERISA whereby the

12  administrator's decision is constrained only by the terms of the policy.[188]

13      Hartford is correct that Rowell's receipt of SSD benefits does not mandate an award of

14  ongoing LTD benefits. But Hartford's failure to acknowledge the SSD award in its initial

15  termination decision raises doubts as to its fair consideration of Rowell's entire record.[189] At least

16  Hartford must be able to explain its contrary result, especially when the standard for a SSD benefit

17  award is more stringent than that employed under the Plan.[190] Here, Defendants fail to address how

18  ---

19  [185] *Cf. Prado v. Allied Domecq Spirits and Wine Group Disability Income Policy*, 800 F. Supp.
    2d 1077, 1099 (N.D. Cal. 2011) (finding that a careful review of insurance administrator's
    surveillance footage demonstrated a level of activity consistent with that reported by the
20  plaintiff).

21  [186] *See* AR 100-112.

22  [187] *Id.* 80.

23  [188] *See* Docket No. 79 (Defs.' Opp'n to Pl.'s Rule 52 Mot.) (citing *Black & Decker Disability
    Plan v. Nord*, 538 U.S. 822, 833 (2003); *Leahy v. Raytheon Corp.*, 315 F.3d 11, 20 (1st Cir.
24  2003)).

25  [189] *See Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 635 (9th Cir. 2009) ("While
    ERISA plan administrators are not bound by the SSA's determination, complete disregard for a
26  contrary conclusion without so much as an explanation raises questions about whether an adverse
    benefits determination was 'the product of a principled and deliberative reasoning process.'")
27  (citing *Glenn v. MetLife*, 461 F.3d 660, 674 (6th Cir. 2006)).

28  [190] *See id.*; *Salomma*, 642 F.3d at 679 (finding "amazing" that the plan administrator would fail to
    address the social security disability award in its denial letters when "[t]he Social Security

31

**United States District Court**
For the Northern District of California

1    Rowell's ongoing eligibility for SSD benefits under the stringent, "substantial gainful activity"

2    standard of the Social Security Act does not support a finding of disability under the substantially

3    less stringent "your occupation" standard for LTD benefits under the Plan.[191] Defendants' reliance

4    on "new evidence" is not persuasive because, as explained above, the evidence supplied by

5    Hartford's investigations and Dr. Powell is entirely consistent with the evidence that Hartford relied

6    on initially.

7        *5.   "Your Occupation" versus "Any Occupation" Standard*

8        Under the terms of the Plan, for 24 months following Rowell's initial LTD claim, his

9    disability must be with respect to an ability to perform the essential duties of his own, former

10   occupation. After 24 months, continuing LTD benefits are available only under the "any occupation"

11   standard, defined as an occupation for which the insured is qualified by education, training or

12   experience, and that has an earnings potential greater than 60% of an indexed, pre-disability earnings

13   amount.[192] The life insurance waiver of premium benefit similarly is available only under a broader

14   "any occupation" standard.[193] These different terms render different outcomes with respect to

15   Hartford's LTD and waiver of life insurance premium decisions.

16       *a.    LTD Benefits Should Be Reinstated Under the "Your Occupation" Standard*

17       Hartford erred in concluding that Rowell was both physically and mentally capable of

18   performing the essential duties of his mechanical designer occupation as of December 23, 2009.[194]

19   Because the evidence provided by Rowell and his treating physicians has remained largely

20   unchanged and is not contradicted by Hartford's investigative results, Hartford termination of LTD

21   benefits indicates a shifting rationale whereby evidence that initially supported a disability finding is

22   no longer sufficient under the same terms of the same plan. Defendants have not disputed Rowell's

23   _____

24   Administration was persuaded that [the claimant] was indeed unable to work at any job in the national economy").

25   [191] *See* 423 U.S.C. § 423(d).

26   [192] *See* AR 1408, 09.

27   [193] *Id.* 1425-26.

28   [194] *Id.*

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
For the Northern District of California

description throughout the record of his occupation as requiring eighty percent computer time and being mentally strenuous. The court thus finds Hartford's conclusion that Rowell's ability to perform "light" and "sedentary" work is consistent with the essential duties of the occupation of mechanical designer[195] to be incongruous with its initial disability determination, as well as with the actual demands of the occupation. That the essential duties of the occupation include "frequent (34-67% of the time) sitting and occasional (1-33% of the time) standing, walking, reaching overhead, and keyboarding/repetitive hand motion"[196] does not negate the fact that it also requires unbroken time on a computer, engaging in mentally demanding work. Rowell's physical ability to sit, stand, reach overhead, etc. is as insufficient as of Hartford's December 23, 2009 termination decision as it was as of Hartford's September 19, 2008 grant of benefits.[197] Defendants' more recent argument that Rowell's description of his weekly activities appears "consistent with the characterization of a person who seems content to enjoy a sedentary lifestyle"[198] also is unpersuasive because it does not negate the fact that those activities are not necessarily indicative of an ability to function in one's "own occupation."

        *b.*      *The Evidence Does Not Support Termination of the Life Insurance Waiver Under the "Any Occupation" Standard*

As noted previously, the denial of the life insurance waiver is reviewed under the "any occupation" standard, defined as a disability that "prevents you from doing any work for which you are or could become qualified by education, training or experience."[199] The parties do not address how exercising this different standard applies to the evidence in the record. Based on the court's review of the record, however, it appears that Rowell is unable to perform "any work" under the waiver of premium disability standard. While the court notes the suggestion of Dr. Powell that some work might be within Rowell's reach, the work would have to be flexible and not place too many interpersonal demands or require excessive time doing those activities that can trigger Rowell's

---

[195] *See* AR 110.

[196] *See id.* 104.

[197] *Id.*

[198] Docket No. 66 at 21 (Defs.' Opening Br. Re: Rule 52 Mot.).

[199] AR 1426.

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW

fatigue. Nothing in the record as discussed at length above suggests that work would satisfy these substantial constraints, and Defendants offer no significant argument or evidence identifying any appropriate distinction applicable to the life insurance waiver of premium issue based on the broader "any occupation standard."[200]

## V.  DISPOSITION

The court GRANTS Rowell's motion for judgment pursuant to Fed. R. Civ. P. 52. Defendants shall reinstate Rowell's LTD benefits. The parties shall meet and confer to address the specific amount of back benefits, as well as reasonable attorneys' fees and costs to be awarded. The parties shall submit a stipulated form of judgment, or if unable to reach agreement on these issues within 21 days of this order, Rowell shall bring a motion setting forth any issues that remain to be resolved by the court.

Dated:    5/14/2012

_____
PAUL S. GREWAL
United States Magistrate Judge

---

[200] Although not addressed by the parties, there would appear to be no reason not to apply this same "any occupation" conclusion to a claim by Rowell for LTD benefits beyond 24 months, which is subject to an almost identical standard.

34

Case No.: 10-5656 PSG
FINDINGS OF FACT AND CONCLUSIONS OF LAW